IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 3, 2024 Session

**STATE OF TENNESSEE v. JUSTIN DANIEL BARKER**

**Appeal from the Circuit Court for Henry County**
**No. 16283    Donald E. Parish, Judge**
_____

**No. W2022-01631-CCA-R3-CD**
_____

A Henry County jury found Defendant, Justin Daniel Barker, guilty of two counts of rape (under alternate theories) and one count of aggravated statutory rape. The trial court imposed an effective sentence of eight and a half years in the Tennessee Department of Correction. On appeal, Defendant argues the trial court erred in admitting testimony related to Defendant's pending criminal proceedings in another jurisdiction, and he contends the evidence was insufficient to sustain the jury's verdicts. After review, we conclude the trial court erred in admitting evidence related to the pending criminal proceedings, but such error was harmless. We also conclude the evidence was sufficient to support Defendant's convictions. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Justin Daniel Barker.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Neil Thompson, District Attorney General; and Rebecca Griffey, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Background

In July 2020, a Henry County Grand Jury indicted Defendant on two counts of rape (under the alternate theories of use of force or coercion and penetration without consent)

and one count of aggravated statutory rape, all against the same victim.[1]  The indictment related to a single incident which occurred in July 2016 and was reported to law enforcement in January 2018.  At the time of the trial in this case, Defendant was facing separate rape charges in Gibson County involving the same victim in this case.[2]

## II. Trial

### A. Jury-Out Hearing

On the first day of trial, the State requested that the trial court hold a jury-out hearing because it had learned Defendant's counsel ("Counsel") intended to cross-examine the victim about certain aspects of the Gibson County allegations.  The court conducted the hearing to determine the extent to which the Gibson County allegations could be referenced in Defendant's Henry County trial.  The State announced it would not introduce the Gibson County allegations in its case-in-chief.  Counsel argued that he wanted to introduce evidence regarding Defendant's other alleged rapes of the victim because such evidence was relevant to impeach the victim.  Specifically, Counsel argued that the victim had made inconsistent statements in separate preliminary hearings in Henry and Gibson Counties, and she continued to associate with Defendant after the July 2016 incident in Henry County.  Counsel said that the Henry and Gibson County "events [were] too intertwined to be able to separate that out."  The victim was called as a witness in the hearing.

As described in significant detail below, the victim, who was thirteen years old at the time of the Henry County offense, testified about the four rapes which she alleged Defendant committed against her.  The first incident, the subject of the current appeal, occurred over the July 4 holiday in 2016 near her grandparents' riverfront trailer house in Henry County.[3]  The victim testified that one evening during the holiday, she and Defendant, who were both staying with their grandparents at the trailer, went for a walk.  As the walk progressed, Defendant suggested that he and the victim engage in sexual behavior, and as described below, Defendant touched the victim in ways that made her uncomfortable.  The victim testified that at the end of the walk, when Defendant and the victim reached the area outside their grandparents' trailer, Defendant pushed the victim against a tree, pulled down her shorts, and penetrated her vagina with his penis.

---

[1] It is the policy of this court not to name victims of sexual offenses.

[2] The disposition of Defendant's Gibson County cases is unclear from the record in this case.

[3] As explained below, the victim referenced her adoptive father's parents as her grandparents.  The victim's grandparents are also Defendant's biological grandparents.

The victim testified that over the next year, the Defendant raped her three more times: once in the summer of 2016 in the swimming pool at her house in Gibson County, and twice at the house Defendant and his grandparents shared in Gibson County in 2017. Defendant's house was next door to the victim's house; she claimed that her grandparents were not home during either of the rapes which she alleged occurred at the grandparents' house. The victim acknowledged testifying in court proceedings in Gibson County regarding these other alleged offenses, but as of the trial in the Henry County case, the Gibson County cases had not gone to trial.

Counsel cross-examined the victim extensively concerning her prior testimony. In answering Counsel's questions, the victim described both the Henry County offense and the alleged Gibson County rapes in great detail. The victim's jury-out testimony was consistent with her trial testimony, and her testimony concerning the three alleged Gibson County rapes will be set forth below in detail.

The trial court issued its ruling regarding the admissibility of the alleged Gibson County incidents:

> The [c]ourt makes the following findings, then, as to, essentially, the introduction of the cross-examination of the victim witness testimony about sexual acts other than charged here in this indictment.
>
> First of all, the [c]ourt in its analysis must determine whether the proffered testimony in this instance by cross-examination is relevant to an issue that is for trial, and the court does find that the testimony that's been elicited during the offer of proof on cross-examination would be relevant. It meets the tests under [Tennessee Rules of Evidence] 401 and 402, which the [c]ourt determines that it will make or may make the existence of some fact in issue more or less relevant or more or less probable to have occurred, depending on what the trier of fact decides about the credibility of the witness.
>
> I find, further, that the testimony doesn't create any sort of danger of unfair prejudice to one side or the other. That part of kind of this overall evidentiary process is usually invoked by the defendant, and here, we have the situation where [Defendant] is actually asking to produce the evidence of other charged alleged misconduct. So, it is somewhat different than the typical case that we see.
>
> The [c]ourt does find that the probative value of the cross-examination information is substantial.

If there is any—following the actual production of the testimony on cross-examination, if there [are] any concerns about misleading the jury, et cetera, then the [c]ourt will give a limiting instruction so they can take the evidence in context.

Now, it's important to note that the evidence is not being elicited to show the character of the alleged victim as a promiscuous person, but, rather, is being offered to show that the complaining witness has made some conflicting statements at various times, apparently under oath, in testifying. Whether those are substantial or not is for the trier of fact to determine.

And the [c]ourt gives an instruction which says to the jury, if you find there are some inconsistencies, then if they are not meaningful—that's my word, not the direct quote, but if they are not meaningful, you should disregard them. So, that's a matter for the jury to ultimately consider, whether or not there were any conflicting statements, and, if so, were they substantial.

Perhaps more importantly, though, the proof that's sought to be elicited on cross-examination is proof about the actions or inactions of the complaining witness when viewed against kind of a standard of what reasonable people might expect in a given circumstance. So, the [c]ourt finds that that testimony is certainly material to an important issue in the case. The credibility of the complaining witness based on the statements that counsel has made to me and from what I gather from your statements during voir dire to the jury is that the most important testimony is, in fact, from the complaining witness. So, her credibility is a very central issue.

. . . .

So, I believe that in this particular circumstance, the right to cross-examine the witness with the information that [Counsel] has done and the way that he's done is vital to the presentation of the defense, and it is vital to his rights of confrontation.

So, the [c]ourt holds that he can ask these questions on cross-examination, but that you're prohibited, [Counsel], from introducing any testimony of this nature about things that have gone on in other counties or at other times here in Henry County by extrinsic information. So, you are limited to cross-examination of this witness.

- 4 -

## B. Proof at Trial

The victim began her trial testimony before the jury by describing the familial relationship between herself, Defendant, and other family members, explaining that she and her parents lived next door to her grandparents, Defendant, and B.B., who was Defendant's minor daughter. B.B. was approximately three years old at the time of the offense. The victim testified that over the July 4 holiday in 2016, she went to her grandmother and grandfather's trailer along the Tennessee River in Henry County. Defendant and B.B. also visited the trailer. The victim explained this trip was the first time visiting the area since her biological father had drowned on the river during the July 4 holiday in 2009.

The night of July 4, 2016, the victim was lying in her grandparents' living room, along with Defendant and B.B. The victim was unable to sleep, so she started to walk out of the trailer. Defendant, who was also awake, asked to join her on a walk, to which she agreed. While Defendant and the victim walked, Defendant began to "make comments about the women he had tried to be with in the past," after which he "started to play with my hair like he would them and to show me how a guy pulls hair." As the conversation progressed, Defendant told the victim that they "weren't blood related, so it would not really be that big of a deal if I rode him, or touched him, or gave him a blow job or whatever."

The victim testified that as their walk continued, Defendant "started to brush up against me," which confused her "because I did not know if he truly meant it or if he accidentally—he would never touch me like that." The victim initially thought Defendant's touching was accidental "until he started to push up against me and then pick me up and bring me back down and make sure I brushed up against him." The victim tried to "kind of get down, get away from the situation," because she was "scared." She was also "a little nervous" because Defendant's actions were something she had never "dealt with before." Nevertheless, Defendant kept touching her. When Defendant and the victim were close to their grandparents' trailer, Defendant pushed the victim, who was wearing a bathing suit under a t-shirt and shorts, into a tree. She said that when she tried to "brush him off, he just kind of shoved his arm up towards my throat and . . . proceeded to pull my pants down enough, untying one of the sides of my bathing suit, and tried to force himself in, and, at first he couldn't fit, so he made it fit." Specifically, the victim said Defendant pulled down his pants and put his penis inside her vagina without her permission. Defendant's act of penetration "hurt. It felt like pressure, physically." The victim said she "was just frozen in shock," adding that she "tried to speak" and "wanted to say something, but nothing came out." She explained that the attack happened around midnight, and although the attack occurred outside her grandparents' trailer, her grandparents and B.B.

- 5 -

were asleep and did not see the attack. The victim was unsure how long the attack took, but testified that "it felt like an eternity."

The victim testified that the attack made her feel "violated" and "very uncomfortable. I had never had anyone ever touch me there before. It was just something that I was uncomfortable with, unfamiliar with, and I just—I didn't want it." She added that she felt many other emotions because she "was in shock of what happened and what was happening."

The victim testified that after the incident, Defendant told her that "nobody would actually believe me that it happened, that I was just—I was just a piece of crap." She added that Defendant told her that if she told her parents, Defendant would tell them about her sending nude photographs to a boy. The victim had confided in Defendant about this activity previously. Defendant also threatened to tell the victim's parents that she "had begged [Defendant] for it" and that she "had a crush on him." The victim denied ever having a crush on Defendant; before the attack, she trusted Defendant and saw him as family and "fun to be around."

The victim did not tell her parents or grandparents about the rape because she "was afraid of a lot of things." As reasons, she recounted that she did not want to see B.B. separated from her father while B.B. was young because the victim had lost her biological father at a young age. The victim added, "I wanted [B.B.] to have something that I did not have much of." She also feared that disclosing the rape would cause deep division and pain amongst her family. The victim testified that after she disclosed the rape there was "a tremendous impact on my family. My dad is torn up. My mom is angry all the time, and she's not an angry woman. My grandmother has to take care of two grandchildren and is torn between the two, so we have two different holidays now."

The victim testified that before disclosing the rape, her mother "had noticed that I wasn't acting like myself. I would stay up in my room. I would be emotional a lot, standoffish towards my dad, men in my life." She added that her mother "didn't know why she was sending me to counseling, and I didn't realize that I was giving off any inkling of what was going on with me at the time." Accordingly, the victim's mother sent the victim to counseling with her former therapist, Dr. Pepper Pratt, who had treated the victim after her father drowned. During one session, Dr. Pratt asked the victim a series of questions about whether she had been abused. Eventually, after extensive questioning, the victim "broke" and admitted that Defendant had raped her. The victim did not believe that her therapist would disclose her discussion of the rape to anyone else, and had she known that the therapist would report her disclosure, she would not have told the therapist about the rape.

- 6 -

When asked how the rape had affected her, the victim stated she had difficulty focusing in school, to the point that she had taken a friend's Adderall without a prescription in an attempt to feel better. She had attempted college classes but withdrew due to her inability to focus. She also found herself depressed and often unwilling to eat.

On cross-examination, the victim again acknowledged she did not contact her parents or tell anyone else about the Henry County rape immediately after it happened. Rather, she returned to her grandparents' trailer and went back to the living room but did not go to sleep. She acknowledged that in an earlier hearing she had testified that she had gone to sleep in the living room, next to Defendant, after returning home, but at trial she stated that at the former hearing she must not have "underst[oo]d the question beforehand." As in the jury-out hearing, the victim acknowledged that at a previous hearing she had testified that she did not tell anyone about the rape because she was scared of Defendant. She denied that Defendant had told her that he would tell other people she was "crazy" if she tried to report the rape; rather, she insisted Defendant told her that nobody would believe her were she to report the rape. The victim also acknowledged former testimony in which she asserted Defendant had stated nobody would believe her because people "would just think I had a crush on him because he had started dating Harlee," Defendant's current girlfriend.

Counsel asked whether the victim, Defendant, their grandparents, and B.B. all went on the July 2016 trip in one vehicle; the victim replied that she rode with her grandfather while Defendant and B.B. rode in her grandmother's car. However, she acknowledged former testimony in which she said she, Defendant, and B.B. all rode to the riverfront trailer with her grandmother.

The victim acknowledged that in former testimony she did not reference her fear that Defendant would disclose that she had sent nude photographs to a classmate. The victim said that "as a fifteen-year-old girl, I did not want to tell a room full of people that I have no idea who they are about my experiences and my personal issues. I was ashamed of that." She did not tell her parents about sending the pictures, though they did "f[i]nd out about that, later on." At trial, the victim asserted, she was older and "ha[d] the guts now to speak out about what happened."

The victim acknowledged that in her former testimony she did not mention B.B.'s potentially being removed from Defendant's care as a reason why she did not disclose the alleged rapes. The victim testified she did so because she "didn't want the main focus to be on my feelings towards [B.B.]."

Defense counsel then asked the victim about the three other allegations of rape she made against Defendant in Gibson County. The first incident was alleged to have occurred

in July 2016, after the Henry County rape. In this incident, the victim alleged Defendant raped her while they were in the swimming pool at her parents' house. She testified that B.B. was at the pool and that her grandmother was home next door, although her parents were not home when this rape allegedly occurred. Although the victim acknowledged that at a former hearing she had testified that she was in the pool for approximately ten minutes before Defendant raped her, as in the jury-out hearing, she testified that she was sitting on the edge of the pool watching B.B. when Defendant pulled her in and raped her. As in the jury-out hearing, the victim testified she was "halfway in the pool, halfway out" before the Defendant's alleged attack. She also asserted, as she had testified at an earlier hearing, B.B. was playing around the diving board during the alleged attack. The victim testified she did not tell the police or anyone in her family about the alleged rape immediately after it happened.

The victim acknowledged appearing in photographs with B.B. taken at a Mexican restaurant in August 2016. She testified that she had been at the house her grandparents and Defendant shared before heading to the restaurant; Defendant asked her to go to the restaurant, and although the victim had some reservations, she went to spend time with B.B. She acknowledged Defendant drove all three of them to the restaurant and a park that day.

The victim then testified about the next alleged rape, which she said took place in spring 2017. She stated that on the day of the attack, she went to her grandmother's house to play with B.B., and her grandparents were home at the time. She testified that she had her cellphone with her that day; she acknowledged former testimony in which she said she did not have the phone, but she added, "I probably thought maybe [Counsel] meant on me, but it was probably set down." The victim testified that her grandparents were present when she arrived at the house that day, but they left to visit "Grandma Hazel," who was the victim's adoptive great grandmother. The victim testified she wanted to return home at that time, but she explained, "My parents were not home, and I really didn't have that option to go back home. I didn't feel safe back at home. I didn't really feel safe anywhere. So, I stayed . . . ." As during the jury-out hearing, the victim acknowledged that Defendant did not "physically" force her to stay, but stated, "he told me I was staying." The victim asserted she "did exactly what he asked [her] to do so [she] wouldn't get hurt and so nobody would find out." She said that Defendant raped her in her grandparents' living room after her grandparents left.

The victim testified that she continued to visit her grandparents' house after the incident. At some point between Halloween and Thanksgiving 2017, she alleged, Defendant raped her again, this time in his bedroom. She asserted that after her grandparents left the house, she went to Defendant's bedroom, with Defendant following

after. She claimed Defendant told her to take her clothes off, and she followed his demands, after which he raped her.

The victim acknowledged she had been caught at school with Adderall, without a prescription. She said she had taken it in an attempt to focus and feel better, and because her school had a zero-tolerance drug policy, she was placed at an alternative school. She agreed this event occurred before her mother made her resume therapy. She again acknowledged she did not tell anyone about the alleged rapes until after she told her therapist. When asked why she did not disclose the allegations earlier, she stated, "It wasn't that I didn't feel like I could tell [my family]. It was the fact that I didn't want to tell anybody." The victim reiterated that she was reluctant to cause division in her family, especially given the possibility that the allegations could cause B.B. to "lose her father."

On redirect examination, the victim testified that she moved her bedroom upstairs at some point because the old bedroom, which had been located on the first floor of her house, "had a window that [Defendant] would come to, and when I wanted to hide out in my room, he would come up to the window and throw a ball at it or try to convince [B.B.] . . . to get me outside[.]"

Sometime during the State's redirect examination of the victim, the prosecutor asked the victim, "To your knowledge, have rape charges been brought against the Defendant in Gibson County?" Counsel objected, stating it was irrelevant whether Defendant had been charged with rape elsewhere. Rather, Counsel insisted that "[t]he issue before the court is whether or not these incidents may or may not have occurred, according to this witness's testimony. She has no involvement in anything pertaining to Gibson County." This prompted a jury-out hearing, at the beginning of which Counsel also asserted the question was outside the scope of his cross-examination.

The prosecutor replied that the State had "not want[ed] to get into any of these incidences over in Gibson County," but after the trial court allowed Counsel to question the victim about them, the prosecutor asserted that "the [S]tate and the victim [are] left in an unfortunate predicament where all these other events have been talked about. . . . And I feel like there's going to be some lingering questions in the jury's mind as to—they don't understand the law." The prosecutor asserted that informing the jury that charges had been brought in Gibson County in response to the victim's allegations was "important" for the jury. The prosecutor continued,

> I'm afraid that, if [jurors are] not at least aware that charges have been brought and that something is pending over there, that they could be in the position of thinking, well, the [S]tate and law enforcement doesn't believe

these other instances, and so nothing has ever been pursued about them. And that further goes—that would undermine the credibility of this victim here.

The prosecutor also announced her intent to ask for a jury instruction "so that the jury doesn't take all of these that I view as irrelevant, peripheral, extraneous events in another county and somehow act prejudicial to the State. It's just kind of an unknown . . . ."[4]

Counsel reiterated his argument that any reference to pending charges in Gibson County would be irrelevant, as such information did not relate to impeaching the victim. Counsel argued that such evidence would also contradict the trial court's earlier order that no extrinsic evidence relating to the alleged Gibson County actions could be introduced. Furthermore, Counsel asserted that such proof would be unduly prejudicial because Defendant had not been convicted of any charges in Gibson County as of the Henry County trial date.

The trial court ruled that the State could "ask [the victim] if charges were brought, if she knows if charges were brought, and if she does, has she given testimony." The court found that defense counsel's line of questions "dealt a great deal about testimony given in Gibson County matters. So, it is fair to fill in that blank." When the jury returned to the courtroom, the prosecutor asked the victim whether she had spoken to law enforcement about her allegations concerning Defendant's Gibson County attacks, whether Defendant had been charged with rape in response to these allegations, whether she had testified in Gibson County concerning these alleged offenses, and whether her former testimony was "given closer in time to the events that were put in question." The victim answered affirmatively to all of those questions but also acknowledged that the Gibson County cases had not yet gone to trial.

Investigator William Vandiver with the Henry County Sheriff's Office learned about this case "on or about January the 26th, 2018," when a Gibson County Sheriff's Office investigator contacted him regarding the victim's allegations against Defendant. Investigator Vandiver interviewed the victim's mother (C.W.) and grandmother (C.S.), and he also reviewed Gibson County Sheriff's Office interviews with the victim. Investigator Vandiver acknowledged no physical examination of the victim was conducted because over a year and a half had elapsed since the Henry County incident. The investigator acknowledged that at the time of the Henry County incident, Defendant was twenty-six years old and the victim was thirteen years old.

C.W., the victim's mother, testified that she started dating her current husband, K.W., in 2010 and met Defendant about that time. K.W. was Defendant's uncle. C.W.

---

[4] The jury charge does not appear in the appellate record.

said that the victim probably first met Defendant when the victim was eight years old. C.W. testified that when she allowed the victim to visit C.S.'s trailer over the July 4 holiday in 2016, she knew Defendant and B.B. would be there. C.W. recalled that B.B. was two or three years old at the time. She said that the victim loved B.B. and "looked at her kind of like a little sister. [The victim] was very protective of [B.B.]." C.W. testified that the victim still loved B.B., but it hurt the victim to see B.B. after this incident.

C.W. testified that when the victim came home from the July 2016 trip, C.W. asked the victim how she was doing because she "was concerned on how it affected [the victim] being at the river" that had been the site of her biological father's death. C.W. testified that the victim "was reserved in her answers. I could kind of tell she wanted to talk more, but I did not want to press her if she was reliving her dad's death, and I didn't press her a whole lot. She did tell me that she was sore." C.W. said the victim said she was "sore in between her legs," but C.W. assumed this pain resulted from the victim's being "out on the river and playing on the tube and riding." The victim reluctantly let C.W. look between her legs; the victim's mother noticed the victim "was real red, and she had a bruise." C.W. clarified that she was referring to the victim's genital area and that the bruise was on the victim's inner thigh. However, C.W. said she "wasn't looking for anything other than [whether] had she traumatized herself from [a] fall or something." When C.W. asked the victim whether she had fallen, the victim replied, "Oh, yeah, that's what happened." C.W. testified that after the July 4 trip:

> [The victim] was different. She was . . . a very happy-go-lucky child [before July 2016]. She love[d] everybody. [She w]ould run up and hug anybody. And she started being more withdrawn, especially towards men. She wouldn't—she wouldn't hug [K.W.] anymore. She wouldn't hug either one of her grandfathers. If a man [came] up and touched her, she would just—I was concerned about that. I didn't know—I felt like something was really wrong, but she wasn't telling me anything.

C.W. testified that the victim, who had done well in school, become unable to focus. As her daughter had testified, C.W. said that the victim took a friend's Adderall without a prescription in an attempt to focus. C.W. noted that at some point in 2018, the victim asked to move her bedroom upstairs. C.W. said that her daughter gave no reason for why she wanted to move her room, other than "[s]he just wanted to be—she wanted to be above. She wanted to be away."

The changes in the victim prompted C.W. to refer her daughter to Dr. Pratt in August 2017. On January 3, 2018, C.W. learned from Dr. Pratt that the victim alleged Defendant had raped her. C.W. said this disclosure left her in "disbelief" and "[f]urious, angry, [and] hurt." The victim told C.W. that she did not tell the family earlier because the victim

"didn't want to hurt us. She didn't want to tear apart a family that was just beginning." After the disclosure, C.W. said that her daughter continued to be unable to focus in school or while being around the family. C.W. said the victim would not "come home because of fear of running into [Defendant]. The memories that are there are really hard for her."

C.W. acknowledged that after the July 4 holiday in 2016, the victim continued to visit her grandparents' house, where Defendant and B.B. also lived, because C.W. "basically forced her to [go] . . . . She would make up excuses on why she didn't want to go, but I would make her go. And then, afterwards, after I finally knew, I quit making her go." C.W. also noted that the allegations had been particularly difficult on C.S., who had to "separate the holidays out to where the two sides don't mix . . . just to try to keep peace."

C.S. testified for the defense. In July 2016, she and her husband, who died in 2020, rented a trailer at a resort along the Tennessee River in Henry County. She explained that the decks of her trailer and the neighbors' trailer "almost touch[ed]," and there was "a walkway between the two decks."

C.S. testified that on July 4, 2016, she and her husband drove Defendant, the victim, and B.B. in her husband's truck to the Henry County riverfront resort. They drove back to their Gibson County residences (which she testified, as did the other witnesses in this case, were next door to each other) the evening of July 5, all in the same truck. C.S. testified that they had watched a fireworks display the evening of July 4, and when she first saw the victim the morning of July 5, nothing about the victim's behavior caused concern. C.S. also denied seeing the victim acting like she did not want to be around Defendant. She also denied "any kind of problems or issues going on between" Defendant and the victim on the drive back to Gibson County. C.S. said that if the victim had told her about anything that may have occurred with Defendant, "We would have gone home immediately. We would have gone to her parents."

C.S. testified that after the July 2016 trip, including the time of the other alleged rapes, the victim would come to the house C.S. shared with Defendant and B.B. frequently. C.S. denied seeing anything troubling with the victim's behavior most of this time. C.S. had served as a teacher for more than forty years before she retired and had encountered students who were experiencing difficulties in their lives. Even with C.S.'s experience as an educator, she did not notice anything in the victim's behavior before the victim's disclosure that would have led C.S. to believe something was amiss. Although the victim began seeing Dr. Pratt in August 2017, C.S. did not learn about the counseling until the victim made her allegations against Defendant in January 2018.

C.S. did not observe any problems with the victim's behavior until December 2017. During the family's Christmas get-togethers at that time, C.S. saw the victim lying "on the

couch. . . .  I asked her what was wrong and she said, 'I just stayed up late last night, and I'm tired.'  I said, 'Okay.'"  C.S. said that at some point in 2017, Defendant began dating his girlfriend, Harlee Henderson,[5] although C.S. did not meet Ms. Henderson until this Christmas gathering.

C.S. acknowledged that "Grandma Hazel" was her husband's mother.  C.S. testified that she and her husband would visit his mother in a nursing home frequently, but the victim was never left alone with Defendant in C.S.'s house while C.S. and her husband went to the nursing home.

C.S. had Defendant leave her house once the victim made the allegations against Defendant.  C.S. testified she did so not because she believed Defendant had done anything to the victim, but because "I thought it was good for him to be somewhere else."  She acknowledged that she continues to "love, care, and support" both the victim and Defendant.  C.S. acknowledged that she has held separate family gatherings after the victim's allegations against Defendant.

Following its deliberations, the jury found Defendant guilty as charged on all three counts.  The trial court merged the two rape counts into a single conviction for rape.  The trial court imposed concurrent sentences of eight and a half years for rape and three years for aggravated statutory rape.[6]  This timely appeal followed.

### III. Analysis

### A. Admission of Evidence Regarding Gibson County Charges

Defendant argues the trial court erred in admitting testimony that the alleged Gibson County rapes of the victim by Defendant were the subject of pending legal proceedings. Defendant contends such testimony impermissibly bolstered the victim's credibility, was irrelevant, and was far more prejudicial than probative.  Defendant also contends the victim's testimony concerning the pending criminal charges was inadmissible hearsay, as she would have had no knowledge that Defendant was facing charges in Gibson County. The State counters that Defendant "opened the door" to testimony about such charges by introducing proof related to the alleged Gibson County offenses and asking the victim about her prior sworn testimony concerning them.  If proof concerning the pending court cases was admitted erroneously, the State contends, such error was harmless.

---

[5] Ms. Henderson testified that she first met Defendant in August 2017.
[6] Defendant does not challenge his sentences on appeal.

- 13 -

## 1. Standards of Review

"Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and [appellate courts] will not interfere with the exercise of that discretion in the absence of a clear showing of abuse [of discretion] appearing on the face of the record." *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014). "An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence." *Id.* (citing *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, 'evidence is relevant if it helps the trier of fact resolve an issue of fact.'" *State v. James*, 81 S.W.3d. 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 4.01[4], at 4-8 (4th ed. 2000)). "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403. Both Defendant's and the State's brief also reference Tennessee Rule of Evidence 404(b), which provides that generally, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." In this court's view, proof related to Defendant's pending charges would not constitute evidence of prior "crimes, wrongs, or acts" for Rule 404(b) purposes. The evidence that the other alleged rapes occurred may have been more appropriate for Rule 404(b) review, but we note it was Defendant who sought to introduce that evidence, and the trial court found evidence of the other alleged offenses admissible as they were relevant to the victim's credibility. Thus, we will resolve the issue of whether the trial court erred in admitting evidence regarding Defendant's pending Gibson County charges by applying the appropriate evidentiary rules.

## 2. Application to Present Case

The threshold question is this: under a relevance analysis, does the fact that criminal charges were pending in Gibson County make the victim more or less credible? In our analysis, we first look at what the existence of other criminal charges against Defendant proved. Pending charges are commonly brought by indictments, and indictments are not evidence but rather charging instruments that inform "the accused of 'the nature and cause of the accusation.'" *State v. Ivy*, 188 S.W.3d 132, 154 (Tenn. 2006) (first quoting U.S. Const. amend. VI; then citing Tenn. Const. art. I, § 9; and then citing Tenn. Code Ann. §

40-13-202). Further, Tennessee juries are commonly instructed in criminal trials that an indictment is "is not evidence against the defendant and does not create any inference of guilt." T.P.I-Crim 1.05 (23rd ed. 2019). As such, the pending Gibson County charges against Defendant had little, if any, evidentiary value.

We are not persuaded by the State's argument that Defendant opened the door to the admission of the evidence through his questioning of the victim in this case. From our review of the record, Defendant's cross-examination of the victim regarding the Gibson County allegations drew attention to the victim's continued association with Defendant when she said she was "terrified" of him, and to statements in the Gibson County preliminary hearing he claimed were inconsistent with parts of her trial testimony. There was nothing in the cross-examination that suggested that the court proceedings where the victim testified were criminal in nature, as opposed to another type of proceeding. And the record is devoid of any questioning, intonation, or argument by Defendant that the Gibson County charges had been dismissed because the authorities did not believe the victim. Even after Defendant asked the victim about the Gibson County allegations, evidence regarding the existence of criminal charges in Gibson County was required to be relevant to the victim's credibility. *See State v. Vance*, 596 S.W.3d 229, 250-51 (Tenn. 2020) ("the remedy sought after a party has opened the door should be both relevant and proportional.")

In its brief, the State cites to our supreme court's decision in *State v. Gilliand*, 22 S.W.3d 266 (Tenn. 2000) where the court noted that background "evidence is often crucial to understanding the other material evidence at trial, and the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question." *Id*. at 273. *Gilliand* is distinguishable from this case. Unlike the instant case, it was the State that sought to admit substantive evidence that the defendant committed "a prior shooting of two individuals, not the defendant. *Id*. at 268. The State did not attempt to introduce evidence the defendant had pending criminal charges from the shootings. Ultimately, though, the *Gilliand* court held that "any conceptual void" created by excluding the evidence would not "have significantly impaired the jury's understanding of the material issues[,]" and that evidence of the prior shooting was admitted in error. *Id*.

Here, we conclude that evidence establishing that Defendant had pending criminal charges for the alleged Gibson County offenses was not relevant to the issue of the victim's credibility. Having concluded that the existence of pending criminal charges in Gibson County was not relevant, Rule 403's balancing test is not invoked. "Only after the court finds that the proffered evidence is relevant does the court then weigh the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial." *James*, 81 S.W.3d. at 757. Because such evidence was not relevant in this case, the trial court abused its discretion in admitting such evidence.

However, such error was harmless. Under Rule 36(b) of the Tennessee Rules of Appellate Procedure, "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Put another way, we must consider whether admission of the evidence affected the verdict. *State v. Simon Dean Porter*, No. M2020-00860-CCA-R3-CD, 2021 WL 4955719 at *24 (Tenn. Crim. App. Oct. 26, 2021) (citing *State v. Martin*, 964 S.W.2d 564, 568 (Tenn. 1998)). This analysis is case specific, and an appellate court considers the whole record to decide reversible error. *Id*. (quoting *Blankenship v. State*, 410 S.W.2d 159, 161 (Tenn. 1966)).

In this case, the substance of the alleged Gibson County rapes—which the State had intended to avoid introducing—were far more prejudicial and damaging to the Defendant than the victim's and investigator's testimony regarding Defendant's pending prosecution in Gibson County. It was Defendant who asked the victim about the substance of the allegations in an attempt to impeach her. And for the same reasons that Defendant's pending Gibson County charges had little or no evidentiary value, they likely had little or no effect on the jury's decision when they had already heard the substance of the allegations. Thus, evidence of the pending Gibson County charges did not "more probably than not" affect Defendant's trial in this case. Finally, because the victim testified in court proceedings related to Defendant's Gibson County charges, the victim had first-hand knowledge of Defendant's Gibson County charges, and therefore her testimony regarding the pending charges did not constitute inadmissible hearsay. Defendant is not entitled to relief on this issue.

## B. Sufficiency of Evidence

Defendant contends the evidence was insufficient for the jury to find Defendant guilty, beyond a reasonable doubt, of rape and aggravated statutory rape. Specifically, Defendant contends the evidence was insufficient because the victim testified she "blacked out" at the same time Defendant penetrated her, and thus she "was not capable of testifying that any act of sexual penetration occurred." Defendant also contends that he could not have been convicted of rape based on the victim's lack of consent because the victim was a juvenile at the time of the offense, she was incapable of consenting to sexual activity, and therefore, this count should not have been presented to the jury. We disagree.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)

- 16 -

(citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence or circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Here, the jury found Defendant guilty of two counts of rape and one count of aggravated statutory rape. As charged in the first count of the indictment, a defendant commits rape when the defendant unlawfully sexually penetrates a victim, the defendant uses force or coercion in penetrating the victim, and the defendant acts intentionally, knowingly, or recklessly. *See* Tenn. Code Ann. § 39-13-502(a)(1). Our criminal code defines "coercion" as "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age." *Id.* § 39-13-502(1). "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of" the criminal code. *Id.* § 39-11-106(a)(14).

As charged in the second count of the indictment, a defendant commits rape when the defendant unlawfully sexually penetrates the victim, the victim does not consent to the penetration (or the defendant knows or has reason to know at the time of penetration that the victim does not consent), and the defendant acts intentionally, knowingly, or recklessly. *Id.* § 39-13-503(a)(2). As charged in the third count of the indictment, a person commits aggravated statutory rape when the defendant unlawfully sexually penetrates a victim who is at least thirteen years of age but less than eighteen years of age, and the defendant acts intentionally, knowingly, or recklessly. *Id.* § 39-13-506(c).

Viewed in the light most favorable to the State, the evidence produced at trial established that at the end of a walk near their grandparents' waterfront trailer—during which Defendant made sexualized comments and touched the then-thirteen-year-old victim in ways that made her uncomfortable—Defendant shoved the victim against a tree and began removing her clothes. When the victim attempted to "brush off" Defendant, he "shoved his arm up toward [the victim's] throat," pulled down her pants, ripped her bathing suit, and penetrated her vagina with his penis. First, the thirteen-year-old victim could not consent. The record is also devoid of any consent by the victim; rather, she said she was "frozen in shock." The victim acknowledged that she "blacked out" sometime during the attack, but she was able to describe Defendant's act of penetration in detail: she testified that Defendant "tried to force himself in, and, at first, he couldn't fit, so he made it fit." The victim testified Defendant's penetration hurt her, that her genital area was sore after the attack, and that she had bruising on her thigh. The victim's mother, when the victim complained of soreness, inspected the victim and saw redness in the victim's vaginal area and a bruise on her inner thigh. At the time of the incident, Defendant was twenty-six years old. We, therefore, conclude the evidence was sufficient for the jury to find Defendant guilty, beyond a reasonable doubt, of rape under both theories charged (use of force or coercion and lack of consent) and of aggravated statutory rape.

Addressing the contentions raised by Defendant, although the victim acknowledged she "blacked out" at some point during the attack, as set forth above, the victim was able to testify about Defendant's penetration of her in vivid detail. Regarding Defendant's contention that the jury should not have considered the charge of rape based on lack of consent because the minor victim could not have consented to sexual activity, Defendant has presented no authority, and this court is unaware of any authority, suggesting that a defendant cannot be convicted of rape based on lack of consent when the victim is under age eighteen. As Defendant recognizes in his brief, consent of a victim to sexual activity is not a defense to statutory rape, *see State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013), but this court fails to see how *Collier* would be applicable to the case under review. The victim's attempt to "brush off" Defendant after he pushed her against the tree (which was preceded by the victim's attempts to rebuff Defendant's advances before the sexual encounter occurred) before penetrating her clearly indicated that she did not consent to the sexual activity—and Defendant knew or should have known that she did not consent. Thus, the evidence was sufficient to convict Defendant of rape under this theory.

Finally, Defendant argues that no corroborating evidence, including medical evidence, was presented to support the victim's allegation that the rape occurred. However, Tennessee's appellate courts have long held that "a defendant may be convicted upon the uncorroborated testimony of one witness." *State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). And our supreme court has stated, "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a

conviction for forcible or coercive sex offenses such as simple rape." *Collier*, 411 S.W.3d at 899; *see also State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (holding the accredited "testimony of a victim, by itself, is sufficient to support a conviction.") (internal citations omitted). The jury in this case, through its verdicts, accredited the victim's testimony concerning the Defendant's attack, so this testimony, by itself, was sufficient to establish that Defendant committed these offenses.

Accordingly, Defendant is not entitled to relief on this issue.

## IV. Conclusion

For the reasons stated above, we affirm the judgments of the trial court.

_____
MATTHEW J. WILSON, JUDGE